IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-05-226-7 |
| | § | CIVIL ACTION NO. H-10-1639 |
| IGBANIBO NATHAN, | § | |
| | § | |
| Defendant-Movant | § | |

**MEMORANDUM AND RECOMMENDATION**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C.

§ 2255 is Movant Igbanibo Nathan's § 2255 Motion to Vacate, Set Aside or Correct Sentence

(Document No. 351),[1] and the United States' Response and Motion to Dismiss Movant's § 2255

Motion (Document Nos. 363, 364).  After reviewing Movant's § 2255 Motion, the Government's

Response and Motion to Dismiss, the record of the proceedings before the District Court in the

underlying criminal case and on appeal, and the applicable case law, the Magistrate Judge

RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss

(Document No. 364) be GRANTED, and that Movant Igbanibo Nathan's § 2255 Motion (Document

No. 351) be DENIED.

I.      **Procedural History**

Movant Igbanibo C. Nathan ("Nathan"), who is currently in the custody of the United States

---

[1] Igbanibo Nathan's Motion to Vacate, Set Aside or Correct Sentence can be found at
Document No. 1 in Civil Action H-10-1639 and at Document No. 351 in Criminal Action No. H-
05-226.

Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is Nathan's first attempt at § 2255 relief.

On May 18, 2005, Nathan was charged by Indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 (Count 1), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 2), aiding and abetting bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Count 3), and money laundering in violation of 18 U.S.C.  § 1956(a)(1)(B)(I) (Counts 4-7). (Document No.  1).  Also charged in the Indictment were Noman Tabani, Mehmood Nazarani, Faisal Saeed Khan, Ahmed Shah, Maged M.  Abuzaid, and Yerisoibi Florence Hamilton.  On February 20, 2007, Nathan was found guilty by jury verdict on all counts charged in the Indictment.  (Document No.  179).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared.  (Document No.  214).  Pursuant to the PSR, Nathan's advisory guideline sentencing range was calculated as follows: (1) Nathan had a base offense level of 22 under U.S.S.G. § 2S1.1(a)(1).  (2) Because Nathan had been convicted under 18 U.S.C. § 1956, his offense level was increased by 2 levels pursuant to U.S.S.G. § 2S1.1(b)(2)(B).  (3) With an adjusted offense level of 24, and a criminal history category if I, he had an advisory guideline sentencing range of 51 to 60 months.  On July 13, 2007, Nathan was sentenced to a total term of imprisonment of 60 months, to be followed by a 3 year term of supervised release, a special assessment of $700.00, and a fine of $3,000.  (Document No.  217, Transcript of Sentencing Hearing, Document No.  278, pp.  8-10].  Judgment was entered on July 25, 2007. (Document No.  223).   With respect to the length of Nathan's sentence, Judge Harmon stated:

Igbanibo C.  Nathan is before the Court as a result of his convictions for conspiracy to commit bank fraud, conspiracy to commit money laundering, and aiding and abetting money laundering.  He has no prior criminal history.

Regarding the instant offense, the defendant, along with his wife and other co-conspirators in this case, were involved in a scheme to fraudulently secure more than $5 million in loans from federally-insured financial institutions which were guaranteed by the Small Business Administration.

Based on a preponderance of the evidence, this defendant is responsible for a total intended loss of $987,611.  His abuse of the Small Business Administration was selfishly motivated by economic factors.  His role is sanctioned by offense level increases.  Of significance is his failure to truthfully testify at his and co-conspirator's trial.  His guideline range is 51 to 63 months.

Considering the totality of factors, a sentence at the high end of the guideline range, 60 months, appears to be sufficient to satisfy the sentencing objectives under the guidelines, including the need to promote respect for the law.  I have considered guidelines and find that a sentence within those guidelines is consistent with and takes into account the purposes of 18 United States Code, Section 3553(A).  (Document No.  278, Transcript of Sentencing Hearing, pp.  7-8).

Nathan appealed his conviction to the Fifth Circuit Court of Appeals.  Unpersuaded by the arguments raised by Nathan, the Fifth Circuit affirmed his conviction. (Document Nos.  316, 317).

The Fifth Circuit wrote:

Igbanibo Nathan and Yerisoibi Hamilton were convicted of multiple counts of bank fraud and money laundering in connection with a land flip scheme.  *See United States v. Sallee,* 984 F.2d 643, 644 n.1 (5th Cir.  1993) (providing a detailed example and explanation of a generic land flip scheme).  Hamilton and Nathan were the escrow agent and the "hard money" lender, respectively, for this land flip.  The district court sentenced Nathan to sixty months imprisonment and three years supervised release. Hamilton was sentenced to ninety-six months imprisonment and five years supervised release.  They now appeal their convictions, and Nathan appeals his sentence.  For the reasons stated below, we AFFIRM.

Nathan and Hamilton both acknowledge that their services were used in a scheme to defraud Banco Popular.  They argue, however, that the Government did not prove that they had the knowledge and specific intent to commit the bank fraud and money laundering counts with which they were charged.  Sufficiency of the evidence supporting a conviction is viewed in the light most favorable to the jury verdict, and

3

this court determines only whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000) (internal quotation marks omitted). At trial, the Government introduced evidence that Hamilton had altered documents during the closing, that Nathan had instructed lenders to make out checks to a third party, that both appellants had been involved with similar transactions in the past, and that Appellants profited from the disbursement of escrow funds at closing to their jointly-owned companies. Based on the strength and nature of this and other circumstantial evidence described in the record, it was reasonable for the jury to infer that Appellants knew of and had the specific intent to commit the charged crimes.

Nathan and Hamilton also objected to the "deliberate ignorance" instruction given to the jury, arguing that it did not require the jury to find that both of them possessed subjective awareness of the illegality. Because they did not object at trial, this court reviews for plain error. The instruction allowed the jury to find that the defendants had knowledge if jurors found that "the defendant deliberately closed his eyes to what would otherwise have been obvious to him" or "deliberately blinded himself to the existence of a fact." This court has noted that these types of instructions should rarely be given, but can be justified where "a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Bieganowski*, 313 F.3d 264, 289 (5th Cir. 2002) (internal quotation marks omitted). Given the facts presented at trial, including the evidence that Appellants had participated in other similarly-executed land flip transactions, the Appellants cannot establish that the Court's use of this instruction was a marked departure from our past cases. *See, e.g., United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990).

Nathan appeals the admission of evidence and the prosecutor's closing argument regarding his immigration status. Because Nathan did not request a limiting instruction or object, we review for plain error only. Nathan had the burden of establishing that allegedly improper remarks in the closing argument were substantial and cast serious doubt on the correctness of the jury's verdict. *United States v. Mares*, 402 F.3d 511, 515 (5th Cir. 2005) (citing *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001)). Nathan also had to show that improper evidence was introduced and that "the need for [a limiting] instruction [was] obvious and the failure to give it [was] so prejudicial as to affect substantial rights of the accused." *United States v. Waldrip*, 981 F.2d 799, 805 (5th Cir. 1993) (internal quotation marks omitted). On direct examination, Nathan described his marriage and reasons for coming to the United States. Hamilton and Nathan were both natives of Nigeria, married each other in the late 1970's, came to the United States in 1982, divorced in 1994, remarried American citizens, divorced those citizens in 2000 or 2001, gained American citizenship in 2001, and remarried one another in 2001. Even while divorced, they continued to have a close relationship. Nathan worked down the hall

4

from Hamilton, co-owned two businesses with her, and recommended her to be the escrow agent for this transaction.  The relationship between Nathan and Hamilton, therefore, was central to the question whether they had knowledge of the conspiracy, and any error was invited by Nathan's statements on direct examination.  *See United States v.  Tullos*, 868 F.2d 689 (5th Cir.  1989).

Finally, Nathan argues that the district court erred when it assessed the loss for sentencing purposes using the purchase price of the collateral in 1998 instead of a 2000 bank appraisal.  He did not object at the time of sentencing and therefore, this court reviews for plain error.  The Application Note 3(E)(ii) to U.S.S.G. § 2B1.1 states that any loss amount shall be reduced by "the fair market value of the collateral at the time of sentencing" if the collateral has not been disposed of by that time.  At the time of sentencing in 2007, there is no evidence that the property had been sold and no current appraisal was presented.

Under plain error review, the error must be obvious and "evident from a plain reading of the statute."  *See United States v.  Aderholt*, 87 F.3d 740, 744 (5th Cir.  1996).  Assuming that the district court incorrectly used the 1998 purchase price instead of the 2000 appraisal, the error was not clear and obvious.  Neither side points to any further guidance in the text of the Guidelines or any precedent that states whether a more recent figure is preferable when a current appraisal is not available.  We have said, however, that where "the district court cannot achieve absolute certainty in determining the lenders' losses ...'[t]he court need only make a reasonable estimate of the loss.'" *United States v.  Goss*, 549 F.3d 1013, 1019 (5th Cir.  2008) (quoting *United States v.  Holbrook*, 499 F.3d 466, 468 (5th Cir.  2007) (matching the language of both U.S.S.G. 2B1.1 app.  n.2(c) (2001) and U.S.S.G. 2B1.1 app.  n.3(C) (2007)).  Because the 1998 purchase price was a reasonable estimate of the property's value when no appraisal contemporaneous or near to the date of sentencing was available, the district court's application of U.S.S.G. 2B1.1 was not plainly wrong.  (Document No.  316; *United States v.  Nathan*, 318 Fed.  App'x 273 (2009) (footnotes omitted).

Within one year of his conviction being final, Nathan timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No.  351).  Nathan raises several grounds for review.  According to Nathan, the jury was tainted by prosecutorial misconduct and by the court's failure to voir dire the panel.  He next alleges prosecutorial misconduct in violation of *Brady v.  Maryland*, 373 U.S. 83 (1963).  In addition, Nathan challenges the untimely disclosure of the presentence report.  He further contends that the court applied an improper methodology for the amount of loss

calculation.   In addition, Nathan argues that he is legally innocent of the money laundering offenses based on the reasoning of *United States v. Santos*, 553 U.S. 507 (2008).   Lastly, Nathan raises several claims of ineffective assistance of counsel.   According to Nathan, his counsel was constitutionally ineffective for failing to investigate the tainted jury or to request dismissal of the tainted jurors; failing to investigate or request evidence withheld in violation of *Brady* such as the complete Banco Popular files, complete Bank United files, and the processing procedures for SBA loans; failing to investigate the PSR or to file objections to the amount of loss calculation; failing to request bank appraisals of the Waller Minimart and Blum Mart properties; failing to investigate the Chicago Title Order and failing to cross examine witnesses; and failing to investigate and raise mitigating factors at sentencing.

The Government, in its Motion to Dismiss and Response to Nathan's § 2255 Motion (Document No. 363, 364) argues that Nathan's § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Nathan is not entitled to relief.   According to the Government, Nathan has not shown that his counsel was deficient nor has he shown he was prejudiced by the alleged errors.   As to his remaining claims, the Government contends that Nathan is not entitled to relief.

The background facts relevant to Nathan's claims are set forth in the offense conduct section of Nathan's PSR.  (Document No. 214).  The PSR states in pertinent part:

> 8.  The SBA is an agency of the United States established by Congress through the Small Business Act of 1953 to provide financial, technical, and management assistance to qualified small businesses.   Mohammad Farooq Samad was a loan broker, who was involved with a number of SBA guaranteed loans which went into default, and, as a result, the SBA barred him, in or about late 1999, from originating further SBA guaranteed loans.   Consequently, Samad then began referring loan borrowers to other brokers, including Noman Tabani.  Samad is currently serving 108

6

months in federal prison for conspiracy and bank fraud.

9.  In 2001, the SBA initiated an investigation which focused on Tabani.  Information indicated that Tabani was fraudulently brokering SBA guaranteed loans to finance property flips at inflated prices.  The investigation revealed that in 2000, Tabani, in concert with others, fraudulently secured more than $5 million in loans from federally insured financial institutions, which were guaranteed by the SBA.  Although a number of suspicious loan transactions were identified, the investigation was limited to four loans.  These loans were referred to as 1st American Trading Company Inc., Blum Mart Inc., Waller Minimart Inc., and Hardin Food Mart Inc.  Banco Popular was the lender on three of the loans.  Bank United funded the fourth loan for Blum Mart Inc.  The loans were all funded between May and September 2000.  It was noted that Faisal Saeed Khan was involved in one loan, 1st American Trading Company Inc.  Florence Hamilton and **Igbanibo C.  Nathan** were criminally involved in three of the loans, 1st American Trading Company, Inc., Blum Mart Inc., and Waller Minimart, Inc.  Although Florence Hamilton was also the escrow officer for the Hardin Food Mart Inc.  loan, according to the Government, there is no evidence that she was criminally involved with this fraudulent loan.

### 1st American SBA Loan (funded May 19, 2000)

10.   Mehmood Nazarani, a/k/a Ali Nazarani, and Faisal Saeed Khan owned and operated a used clothing exportation business which purchased, packaged and resold the clothing in bulk to other countries.  The name of the business was 1st American Trading Company.  In early 2000, Nazarani and Khan, who had been looking for more warehouse space for their business, entered into an agreement to purchase a warehouse located at 7413 Mesa Drive, in Houston, for $1.5 million.  Nazarani contacted Samad, who was a real estate mortgage broker in their community.  Samad in turn referred Nazarani to another real estate mortgage broker, Noman Tabani, who helped Nazarani and Khan secure a SBA loan for the purchase of the warehouse and additional funding for building improvements and working capital.  Because 1st American lacked the sufficient funding for a down payment on the loan, Tabani devised a plan for 1st American to borrow the down payment, purchase price and additional amounts for working capital and improvements.

11.  On March 7, 2000, Nazarani and Khan completed and signed the initial SBA loan application, misrepresenting on the application that the market value of the Mesa Drive warehouse was $2.2 million.  Nazarani and Khan reported they would put up $400,000 cash as a down payment, thus, the purchase price was reported as $1.8 million, rather than the actual purchase price of $1.5 million.  Additional funding was requested for building improvements and working capital for a total loan application request of $2.4 million.  As part of the loan agreement, it was represented that Nazarani and Khan would provide an equity injection of 20% of the total cost of the

$2.4 million loan, or $600,000.  (This included the $400,000 cash down payment.)

12.   Through his father, Tabani referred the SBA loan application to Banco Popular, which paid a $24,000 referral fee to Tabani's father.  According to the government, Banco Popular conducted an independent appraisal of the Mesa Drive warehouse which showed that the property was valued at $3 million, which was more than the loan amount.  (This fact is also stipulated to in Faisal Khan's plea agreement, which further states there is no evidence to show that the appraisal was fraudulent or influenced by Khan.)

13.   Prior to the closing, Florence Hamilton, who was the Chicago Title escrow officer involved in the transaction, forwarded a false and forged purchase contract reflecting that Nazarani and Khan were purchasing the warehouse from MTGRP Investors, LP, for $2.2 million.  The fraudulent contract was faxed to the seller's representative, Andy Waldman, prior to the closing.  Waldman called Hamilton upon realizing the contract had been falsified and forged.  Waldman told Hamilton the sales price was $1.5 million that the MTGRP's signature had been forged on the contract.  Hamilton responded by initially stating that this was the contract she had been given, and then told Waldman that the buyer was flipping the property to an associated party and needed the excess funds to make repairs.

14.   According to Nazarani and Khan's real estate agent, Roberson, when he later questioned Nazarani and Khan about the fraudulent and forged purchase contract Hamilton had faxed to the sellers, Nazarani and Khan blamed the error on Tabani, their mortgage broker.

15.   In order to "flip" the property, Khan and Nazarani recruited their family members into the scheme to act as straw purchasers then sellers.  On April 1, 2000, Ahmed Shah, Khan's younger brother, and Anjuman Dhannani, Nazarani's wife, signed a Partnership Agreement to form American Traders Enterprises.  American Traders was formed to buy the warehouse property for $1.5 million from MTGRP and then simultaneously "flip" the property to 1st American (Nazarani and Khan) for $2.2 million.

16.   On April 14, 2000, Nazarani sent a fax to Roberson, 1st American's real estate agent, and instructed him to change the name of the purchaser on the $1.5 million sales contract to American Traders Enterprises (in place of 1st American Trading.)  It is noted that the $20,000 earnest money deposit required by MTGRP as part of the sale was paid by 1st American for American Traders.

17.   Khan submitted and signed a fraudulent purchase contract to Banco Popular which stated he was actually purchasing the warehouse from American Traders for $2.2 million.  Khan misrepresented that 1st American was paying $400,000 cash

towards the purchase price and that the remaining $1.8 million would be financed. Shah signed the false purchase contract on behalf of the seller, American Traders.

18.   On May 19, 2000, Nazarani and Khan signed the loan agreement with Banco Popular agreeing that they would use $1.8 million of the $1,846,469 disbursement to purchase the warehouse.  Nazarani and Khan also signed a settlement statement representing that 1st American was purchasing the warehouse from American Traders for $2,200,000 (with Nazarani and Khan providing $400,000 of the funding.)

19.   On May 19, 2000, Hamilton performed a fraudulent double escrow closing. Hamilton misrepresented the $1.5 million sale from MTGRP to American Traders as a "cash deal" on the HUD-1 Settlement Statement.  In fact, American Traders did not pay any funds towards the purchase of the property.  Hamilton settled the first sale with MTGRP, by allowing 1st American to fund the $20,000 earnest money deposit on behalf of American Traders; and by transferring 1st American's loan proceeds to American Traders.

20.   On May 22, 2000, Hamilton faxed a copy of the HUD-1 Settlement Statement on the second sale between American Traders and 1st American to Banco Popular. Hamilton misrepresented that approximately $375,283 in cash had been received by 1st American, by providing copies of cashiers checks as evidence.  However, Hamilton never deposited these cashier's checks into the escrow account.

21.   The investigation later determined that Tabani had arranged for Maged Abuzaid, a business associate of Tabani's, to purchase the three cashiers checks totaling approximately $375,000, and to list 1st American as the purchaser.  Abuzaid recruited unsuspecting friends for funding.  Bank records also showed that some of these funds were obtained from Farooq Samad, who had originally referred Nazarani and Khan to Tabani.

22.   On May 23, 2000, Banco Popular wired loan proceeds totaling approximately $1,846,469 to Chicago Title's escrow account to partially fund the 1st American loan. Hamilton issued a sales proceeds check from the escrow account to American Traders for $666,928.  Bank records showed the check was cashed at Sterling Bank, where American Traders had opened an account.  Consequently Shah, on behalf of American Traders, purchased two cashiers checks, one for $225,000 made payable to Abuzaid, and one for $150,000 made payable to Abuzaid's friend, Solomon George.  This was reimbursement for the $375,000 in cashiers checks purchased to falsify the borrower's required equity injection.  Shah disbursed $260,000 to Nazarani and Khan and $17,000 to himself.

23.   Hamilton also disbursed $35,950 to herself and **Nathan** under the guise of a real estate consultation fee and a "document research" fee.  Hamilton placed a fictitious

9

invoice in the escrow file, which was dated May 12, 2000, and billed from Security Mortgage Company (SMC) to American Traders for $35,000. Hamilton then issued an escrow check for $35,000 payable to SMC. The check was deposited into the SMC account at Sterling Bank. The account's co-signers were Hamilton and Igbanibo **Nathan**. (**Nathan** and Hamilton were not married at the time). This same date, May 23, 2000, **Nathan** transferred $12,000 to Abuzaid and $13,000 to Samad from the SMC account.

24. Two additional fictitious invoices from Temple Southland Corporation, one for $650, billed to American Traders, and one for $300, billed to 1st American, were placed in the escrow file. On May 23, 2000, Hamilton issued an escrow check payable for $*950* to Temple Southland Corporation. The investigation determined Hamilton and **Nathan** controlled the account in the name of Temple Southland Corporation.

25. On July 3, 2000, Nazarani faxed a copy of the construction contract for 1st American to Banco Popular. The contract reflected that Falcon Construction Company agreed to do contract work on the Mesa Drive warehouse for the sum of $315,000. Subsequently, Nazarani sent false invoices of the construction work to Banco Popular. Thus, construction loan proceeds were disbursed to 1st American totaling $315,000. The investigation later determined that the owner of Falcon Construction, Mohammed Feroze, was a friend of Khan's who had agreed to pretend to be Khan and Nazarani's contractor as a personal favor to Khan. Although 1st American did have construction repair work done at the warehouse by another contractor, the total bill only amounted to $153,000.

26. Between June 2000 and June 2001, Nazarani and Khan also received construction loan disbursements of $315,000 and working capital loan disbursements for salaries and inventory totaling $385,000 from Banco Popular as part of the SBA loan. Bank account records showed that Nazarani and Khan misused $151,419 of these proceeds for personal expenses which were not permitted under the loan Authorization. It is noted that Nazarani used the majority of the money for personal expenses which included cash withdrawals, payments on credit cards and the purchase of a new vehicle. A total of $18,500 was wire transferred overseas to Pakistan and South America. Khan purchased a cashier's check for $20,000 made payable to Farooq Samad.

27. 1st American made irregular monthly payments on its SBA loan until May 2003, at which time it went into default. 1st American forfeited its corporate charter in November 2003.

28. In February 2006, Khan sold the Mesa warehouse property for approximately $2,550,000 and paid the loan to Banco Popular in full.

29.  By May 2006, upon indictment, Tabani and Nazarani had left the United States. They remain fugitives.

30.  Pursuant to U.S.S.G.§ 2F1.1, comment.(n. 8(c)), in fraudulent loan applications, the loss is the actual loss to the victim or the expected loss if an actual loss has not yet come about.  Thus, if a defendant misrepresents the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered from assets pledged to secure the loan. However, if the intended loss is greater than the actual loss, the intended loss should be used.  In the instant offense, Khan and Nazarani did misrepresent their assets. However, because Banco Popular appraised the warehouse property for $3,000,000, which was at a greater value than the loan amount, there is no intended loss for guideline calculation purposes.  The fraud did involve more than minimal planning.

31.  With respect to the amount of funds laundered, Hamilton and **Nathan** are responsible for aiding in the laundering of at least $521,450 in fraudulently obtained funds as depicted below.

32.  On May 23, 2000, Banco Popular wired 1st American's loan proceeds, totaling $1,846,469.16, to the escrow account.  Hamilton then disbursed $666,928.66 from the escrow account to American Traders.  Shah, acting on behalf of American Traders disbursed $*225,000* to Abuzaid, and obtained two cashiers checks in amounts of $*111,000* and $*138,000* made payable to American Traders.  Nazarani took these cashiers checks and deposited them into a 1st American account which he controlled with Khan.

33.  Also on May 23, 2000, Hamilton disbursed $*35,950* from the escrow account to SMC, a company she and **Nathan** controlled, under the guise of a real estate consultation and research fee.  **Nathan** then disbursed $12,000 of the $*35,950* to Abuzaid.  On June 6, 2000, Shah obtained a cashiers check in the amount of $*2,500* made payable to his brother, Khan.  On June 30, 2000, Shah obtained a $*10,000* cashiers check made payable to himself.

Blum Mart, Inc., (funded June 29, 2000).

34.  In late Summer of 1999, Hasan Chowdhury, his brother, Duke Khan, and Farooq Samad negotiated to buy a gas station business and its real estate in Blum, Texas, for a total price of $390,000.  The Baldwins owned the business and A.J. Lambert, of Lambert Oil, owned the real property on which the business was located.  The initial contract showed the buyer listed as "Galaxy Marketing Services and or assignee."  On September 9, 1999, Samad instructed the seller's attorney to change the initial contract's listed buyer to Duke Khan's company, Rio Vista Minimarts Inc.  Duke Khan then signed two sales contracts (one for the business and one for the property)

11

on September 15, 1999.

35.  In order to "flip" the property, Habib Murshed recruited Assad Chowdory to secure a $750,000 SBA guaranteed loan from Bank United to purchase the Blum Mart business and property from Duke Khan's company, Rio Vista Minimarts Inc. When Assad Chowdory told Murshed he did not have any money in the bank to purchase the property, Murshed told Assad Chowdory that Farooq Samad would help him with the financing.  Samad subsequently had Assad Chowdory sign a blank personal financial statement.  Samad told Assad Chowdhury that he would fill in the information later.  When Assad Chowdory questioned why he should pay $600,000 for a property that was sold for $390,000, Murshed advised Assad Chowdory that he could sell the property for a much greater amount.  Assad Chowdory later told case agents he reluctantly agreed to purchase the property for eventual resale as he needed the money, and Samad was willing to help him arrange financing.  Assad Chowdory then formed Blum Mart Inc., in order to purchase the property from Rio Vista Minimarts, Inc.

36.  On January 1, 2000, Tabani, who was the loan broker, referred the deal to Bank United.  Tabani submitted a fraudulent loan application and false purchase contract to Bank United to secure a $750,000 loan to Blum Mart, Inc.  Tabani also submitted fraudulent documents and cashiers checks to Bank United which misrepresented Blum Mart's Inc.'s equity injection.

37.  In early April 2000, Assad Chowdory went to Samad's office and saw paperwork showing a sale price of $900,000 for the Blum property.  When Assad Chowdory questioned Samad, Samad explained that in order to guarantee that they receive $600,000, they had to apply for a $900,000 loan, as the bank always approved less than requested.  Samad told Assad Chowdory that he would be interviewed by Bank United, and that Assad Chowdory was to say the loan request was for $900,000 and had been arranged by his broker, Tabani.  Assad Chowdory was also told to falsely represent that he had $130,000 in his bank account to be invested in Blum Mart property.

38.  On April 9, 2000, Assad Chowdory met with Samad, Murshed, Tabani and Duke Khan.  Samad asked everyone to buy cashier checks made payable to the Baldwins in whatever amounts they could afford, in order to come up with Assad Chowdory's required borrower's equity cash injection of $100,000.  The cashier checks were then copied and faxed to Samad, then redeposited back into the original bank accounts. On April 14, 2000, Tabani provided the copies to Hamilton who faxed the financial documents to Bank United in order to make it appear that the borrower's required equity injection was in the escrow account.

39.  On June 16, 2000, A.J. Lambert and his attorney met with Blum Mart Inc., which

was represented by Chowdhury, Samad and Murshed, to sign the closing documents. The seller's attorney, Lummus, questioned the inflated sales price of $900,000 rather than the agreed upon $390,000. Lummus called Hamilton, who was the acting escrow officer, to inform her that the price was incorrect and that his client could not sign the contract. Hamilton initially told the attorney that she already had in her possession signed contracts from the seller showing the $900,000 price. When the attorney advised the documents were forged, as the seller had never signed a contract for $900,000, Hamilton stated she would call Bank United and let them know the sales price had changed. The attorney advised the seller not to sign the false contract, and the meeting ended.

40.   When the sellers A.J. Lambert and Mrs. Baldwin refused to sign the sales contract, Chowdhury, Samad and Murshed formed a "shell" corporation, called "Lamberta Oil Company, Inc. (Lamberta.)" Duke Khan then opened a bank account in "Lamberta's" name.

41.   On June 20, 2000, Lummus called Hamilton and inquired about the status of the Blum Mart sale. Hamilton advised she was still discussing the matter with the lender's attorney as the broker had not been truthful.

42.   On June 20, 2000, Hamilton faxed a fraudulent contract to Bank United which showed Blum Mart Inc. was purchasing the Blum Mart property from "Lamberta" for $900,000. In order to explain the sudden change in the seller, Bank United was told that "Lamberta" was a subsidiary company of the original seller, A.J. Lambert's company, Lambert Oil. Hamilton never told Bank United about the double escrow closing nor did Hamilton tell Bank United about the forged signatures of Mrs. Baldwin and A.J. Lambert on the initial purchase contracts.

43.   On June 23, 2000, a representative from Bank United, Tabani, Hamilton, and Assad Chowdory and his wife attended the closing conference at Chicago Title. The sellers did not attend. Hamilton later provided Bank United with the closing documents from "Lamberta" signed by Catherine Fontenot, who was really an employee of Murshed's and had been asked to act as the Vice President of "Lamberta." Fontenot subsequently told case agents that Murshed promised her a promotion if she would assist him in this transaction. Fontenot also stated that, at the closing, Hamilton never asked her for a check, but rather showed her where to sign on the signature pages of two documents.

44.   On June 23, 2000, Hamilton faxed closing documents to Lummus, A.J. Lambert and Mrs. Baldwin, which included a HUD-1 settlement statement reflecting a cash transaction and sales price of $390,000; and an Assignment of Contract which transferred the purchasing right from Rio Vista Minimarts Inc, to "Lamberta." Case agents noted that the Assignment of Contract was dated June 15, 2000, which was

one day prior to the formation of "Lamberta Oil Company, Inc." Baldwin and A.J. Lambert signed the closing documents, although A.J. Lambert was uneasy about the buyers utilizing a name similar to his company's to buy the Blum Mart property.

45. Hamilton submitted a signed Commitment of Title Insurance issued on June 21, 2000, but effective as of May 26, 2000, to Bank United. This Commitment falsely represented that the "Lamberta Oil Company, Inc." had title to the Blum Mart property since the effective date of May 26, 2000. Hamilton knew this was a false statement as "Lamberta" did not purchase the property until June 23, 2000. (According to Bank United, the Title Commitment is heavily relied upon as it ensures the lender that the entity selling the real property has legal title to transfer it to the borrower.) Hamilton also submitted a false Title Commitment to Bank United which showed a fraudulent purchase contract in the amount of $900,000 for the Blum Mart property and that the borrower, Blum Mart, Inc., was securing a mortgage for $750,000.

46. On June 27, 2000, Hamilton deposited two cashier checks totaling $40,000 from Abuzaid, in the escrow account. Abuzaid had listed the purchaser of the checks as Blum Mart Inc. Hamilton then falsely reported to Bank United that she had only received $21,600 from Blum Mart Inc., and that a "Seller's Credit" of $68,400 was given to Blum Mart, Inc. which satisfied the required $100,000 equity injection.

47. On June 29, 2000, based on the misrepresentations, Bank United wire transferred proceeds totaling $707,914.38 to the escrow account to fund the Blum Mart loan. In addition to the $40,000 in deposits from Abuzaid, the escrow account also held a $2,000 earnest money deposit made by Duke Khan. All total, the escrow account held $749,914.38. Case agents determined that Hamilton's double escrow closings allowed the conspirators to receive fraudulent disbursements totaling $339,430.35.

48. Hamilton laundered the $*339,430.35*, by disbursing $275,000 and $20,000 to Tabani. The checks were made payable to entities Tabani controlled, i.e., Pieco, Inc. and Suncoast Company. Tabani then disbursed some of these funds to others including Abuzaid and Murshed. Hamilton disbursed $12,000 to SMC, and made disbursements of $900 and $950 to Temple Southland. Hamilton and **Nathan** controlled both companies. Hamilton disbursed $2,000, recorded as a legal fee to an individual named Altaf Adam (later identified as Samad's attorney); $20,185.85 to Duke Khan and $8,394.50 to Assad Chowdory.

49. Ultimately, Assad Chowdory defaulted on the Blum Mart loan, resulting in an outstanding principal loan balance of $628,936.01. SBA, which had authorized a 75% guarantee on the loan, paid Bank United (now Washington Mutual Bank) it's percentage. Thus, SBA sustained a loss of $345,914.81. For fraud calculations purposes, although the value of the recovered collateral is unknown, the actual losses

of SBA ($345,914.81) and Bank United ($238,021.20) will be used for a total of $628,936.01.

50. On October 26, 2000, four months after the closing and six days after Hamilton learned of the Office of Inspector General investigation, Hamilton disbursed additional escrow funds of $350 to her Temple Southland account. Hamilton then had the Blum Mart property deeds recorded in the County Clerk's Office, and falsely notarized the Special Cash Warranty Deed by stating that the Vice President of Lamberta Oil Company, Inc., Catherine Fontenot, appeared before her on November 13, 2000, to transfer the Blum Mart property from Lambert Oil Company to Lamberta Oil Company.

Waller Minimart Inc., (funded July 7, 2000)

51. Murshed owned an Exxon gas station and convenience store in Waller, Texas, which he wanted to sell. In early 2000, Murshed and Abu Naser recruited Mohammad Rahman to apply for a SBA guaranteed loan and buy Murshed's gas station for $1.5 million. The loan application had already been completed by Samad, when Rahman first came from New York to meet with Murshed, Samad and Tabani.

52. Samad instructed Rahman to tell Banco Popular during the upcoming loan interview that he [Rahman] had convenience store experience and that he had received the $160,000 required equity injection from relatives. Paperwork was filed to falsely represent that Rahman had ownership and control over Waller Minimart, Inc., in order to purchase the property. The address used to incorporate Waller Minimart, Inc., belonged to Abu Naser.

53. Tabani, acted as the loan broker and Hamilton acted as the escrow officer. The SBA loan authorization required Waller Minimart to make a cash injection of at least $200,000 into the business as equity capital. In order to come up with the majority of the equity injection, **Igbanibo Nathan** contacted Solomon George and advised George that he could make $9,000, if George made a short-term loan of $150,000 to Waller Minimart, Inc. **Nathan** instructed George to purchase a cashiers check for $150,000 made payable to Chicago Title and list the purchaser as Waller Minimart. A second cashier's check for $31,570 was purchased by Murshed.

54. On May 12, 2000, Banco Popular approved the $1,000,000 loan and SBA approved a guaranty of 75%.

55. On June 30, 2000, Hamilton submitted a fraudulent HUD-1 Settlement Statement to Banco Popular which reflected a real estate consultation fee of $11,000 from Hamilton's controlled company, SMC; a "pump/enviro." consultation fee of $159,000 from George's company, GEOSOL; a $10,000 consultation fee from Tabani's

company, Suncoast Construction. Hamilton also submitted fictitious invoices to support these reported fees. Banco Popular rejected these fees and thus, on July 7, 2000, Hamilton submitted a revised HUD-1 Settlement Statement which eliminated the fees.

56. On July 7, 2000, Banco Popular authorized the funding of $1,000,000. Hamilton disbursed the fraudulently obtained escrow proceeds totaling $1,135,452.40 to Murshed. After the proceeds were deposited into Murshed's business account, Murshed purchased cashier's checks and paid $10,000 to Tabani; $5,000 to Naser; $100,000 to Altaf Adam; $12,500 to Hamilton through her and **Nathan**'s company SMC; $39,000 to Samad; and $159,000 to George through Peter Delamora (per George's instructions as Delamora had helped George obtain the funding). George ultimately told **Nathan** to keep $2,000, as George had realized a significant profit through **Nathan**'s investment referral. Thus, a total of $*325,500* was laundered.

57. In 2001, Rahman defaulted on the Waller Minimart loan and filed for bankruptcy. The principal loss to Banco Popular was $987,677.11. However, this does not consider the recovered value of the collateral property. Because the value of the recovered collateral is unknown, the estimated recovered value of $410,000, which was the purchase price of the property in 1998 before the fraud was initiated, will be used. Thus, the estimated loss to Banco Popular is estimated at $577,611. (However, SBA had a 75% purchase guaranty arrangement).

58. On October 20, 2000, case agents interviewed Hamilton, who stated she had closed several other deals which Tabani brokered, including Blum Mart Inc., Waller Minimart, Inc., and Hardin Foodmart. According to Hamilton, Tony Rice at Banco Popular financed all of these purchases. Hamilton noted she was becoming uncomfortable doing business with Tabani because she could not always get a straight answer from him, and thus she had intended to end her business relationship with him.

Role of the Defendant

59. In summary, **Nathan** is responsible for assisting in laundering a total of $847,040 (comprised of $521,490 for 1st American and $325,550 for Waller Minimart). Unlike Tabani or Hamilton, **Nathan** was not one of the co-conspirators in the forefront, but he did aid the fraud by soliciting funds for the required equity injections and by laundering the funds back to the equity contributors, such as Abuzaid in the 1st American loan and George in the Waller Minimart loan. **Nathan** jointly benefitted from the funds Hamilton received through their SMC and Temple Southland accounts in the Blum Mart transaction, however, there is no evidence to suggest **Nathan** assisted in the specific fraudulent real estate transaction, and thus, he will not be held accountable for the fraud or the laundered funds associated with Blum Mart. With respect to **Nathan**, the fraud for which he is accountable totaled $577,611 (comprised

of $0.00 for 1ˢᵗ American; and $577,611 for Wallter Minimart).  The fraud involved more than minimal planning and more than one victim.  It was deemed sophisticated in that straw companies were created to fraudulently inflate the value of the property and to conceal the proceeds.  Both Hamilton and **Nathan** are viewed as average participants.  (Document No.  214) (Italics and Bold in original).

## II.  Discussion

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error

by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) recently discussed *Strickland* in the context of a habeas proceeding involving a state conviction. While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that there are

"'countless ways to provide effective assistance in any given case.  Even the best criminal defense

attorneys would not defend a particular client in the same way.'  Rare are the situations in which the

'wide latitude counsel must have in making tactical decisions' will be limited to any one technique

or approach."  *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).    As a result, counsel's

performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that

counsel formulated a strategy that was reasonable at the time and balanced limited resources with

effective trial tactics and strategies.  *Harrington*, 131 S.Ct.  at 789.  "Just as there is no expectation

that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for

a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote

possibilities."  *Harrington*, 131 S.Ct.  at 791.  Moreover, "it is difficult to establish ineffective

assistance when counsel's *overall* performance indicates active and capable advocacy."  *Harrington*,

131 S.Ct.  at 791 (emphasis added).  Finally, in considering the prejudice prong of *Strickland*, the

likelihood of a different result must be substantial, not just conceivable.  *Id.*  at 791-792 (Citations

omitted).  As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from

*Padilla v.  Kentucky*, 559 U.S.  ___, ___, 130 S.Ct.  1473, 1485 (2010)).  The Court observed:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew
> of materials outside the record, and interacted with the client, with opposing counsel,
> and with the judge.  It is "all too tempting" to "second-guess counsel's assistance
> after conviction or adverse sentence."  The question is whether an attorney's
> representation amounted to incompetence under "prevailing professional norms," not
> whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct.  at 778 (citations omitted).

As to the specific examples of ineffective assistance of counsel which Nathan cites in support

of his ineffectiveness claims, such as that counsel could have and should have investigated an

improper juror contact and requested that the juror be dismissed from the panel; failed to investigate or request evidence withheld in violation of *Brady*; failed to investigate the PSR or file objections to the amount of loss calculation; failed to request bank appraisals of Waller Minimart and Blum Mart properties; failed to investigate the Chicago Title Order and failed to effectively cross examine a witness; and failed to investigate and raise mitigating factors at sentencing, the record either affirmatively shows that Nathan's counsel was not deficient or there is no evidence that the alleged errors prejudiced Nathan within the meaning of *Strickland*.

Nathan suggests that counsel could have and should have requested bank appraisals of Waller Minimart and the Blum Mart properties, and that he was prejudiced by counsel's failure to investigate the value of the properties. The Government responds that Nathan's ineffective assistance of counsel claim based on counsel's failure to request the appraisals is conclusional because Nathan does not describe with specificity what the investigation would have revealed or how it would have altered the outcome of the case.

When an ineffective assistance of counsel claim is based on counsel's failure to investigate, the Fifth Circuit has held that a movant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). Here, Nathan does not allege with specificity the need for the appraisals nor does he show that had counsel had the appraisals that the outcome of the trial would have been different. The record further shows that Nathan was not held accountable for fraud or the laundered funds associated with Blum Mart. "Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998)*, cert. denied*, 525 U.S. 1174 (1999  The Fifth Circuit has held that

20

the "failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.), *cert. denied*, 513 U.S. 966 (1994); *Parr v. Quarterman*. 472 F.3d 245, 256 (5th Cir. 2006)*, cert. denied*, 551 U.S. 1133 (2007) (holding that counsel was not deficient in failing to present a meritless argument (citation omitted).

Nathan also alleges that counsel failed to investigate and obtain documents. Other than Nathan's vague references to the documents, he fails to identify with specificity the documents that counsel could have and should have obtained and fails to substantiate his claim that the documents were exculpatory. Nathan suggests that bank files, underwriting guidelines, and procedures for processing SBA loans were not disclosed. However, Mr. Chernoff's thorough examination of the Government's witnesses showed his familiarity with the exhibits including the bank files, and the procedures of title offices such as Chicago Title and for obtaining SBA loans.

As to Nathan's conclusional allegations relating to the "Chicago Title Order" and failure to examine witnesses, the record shows that the "Chicago Title Order" was the subject of a Motion in Limine.

To the extent that Nathan suggests the evidence was insufficient to support his convictions, the Fifth Circuit reached the opposite conclusion. The Fifth Circuit wrote:

> Nathan and Hamilton both acknowledge that their services were used in a scheme to defraud Banco Popular. They argue, however, that the Government did not prove that they had the knowledge and specific intent to commit the bank fraud and money laundering counts with which they were charged....At trial, the Government introduced evidence that Hamilton had altered documents during the closing, that Nathan had instructed lenders to make out checks to a third party, that both appellants had been involved with similar transactions in the past, and that Appellants profited from the disbursement of escrow funds at closing to their jointly-owned companies. Based on the strength and nature of this and other circumstantial evidence described in the record, it was reasonable for the jury to infer that Appellants knew of and had the specific intent to commit the charged crimes. (Document No. 316).

21

Nathan also argues that counsel was ineffective for failing to investigate the tainted jury pool and to request dismissal of the tainted juror. According to Nathan, there was an impermissible contact on the fifth day of trial between the Government and a juror. The Government responds that Nathan's allegations are vague given that he does not state with specificity the nature of the contact or the objectionable comments allegedly made by the prosecutor. To the extent that Nathan suggests that counsel was ineffective for failing to object when a juror had a conversation with a paralegal who was employed the Government, the record shows that the matter was immediately brought to attention of the Court. According to the Government, the paralegal had an inadvertent conversation with one of the jurors in the parking garage about how to get out of the parking garage. Mr. Chernoff did not object since the subject matter of the conversation was not relevant to the trial. (Document No. 286, p. 1512). Again, Nathan has not shown there was any legal basis for counsel to object to the juror contact given the limited nature of the conversation.

Nathan also alleges that counsel was ineffective by failing to investigate the PSR or file objections to the amount of loss. According to Nathan, counsel failed to timely disclose the PSR to him and failed to file any objections. Nathan maintains that had counsel presented "mitigating factors" with regard of the amount of loss, that his sentence would have been substantially lower. The Government responds that Nathan's claim is without merit because he fails to identify the mitigating factors that counsel could have argued that would have resulted in a substantially lower sentence.

The record shows that no written objections to the PSR were filed by Mr. Chernoff. However, at the October 10, 2007, Sentencing Hearing, (Document No. 278), Mr. Chernoff explained why no written objections were filed and described the discussions he had with Nathan

about the application of the guidelines:

The Court: All right. Now, Mr. Chernoff did not file any objections to the presence report, but I want to find out if you have any objections to the report that you would like to make at this time.

Mr. Chernoff: Other than disagreeing with the facts.

The Court: Right. Well, I mean, you maintain that you were innocent of the charges; but that's not what I'm talking about. I just mean some kind of objection in terms of the calculations or of the guideline range or the application of the laws to the facts or anything of that kind.

Mr. Chernoff: Mr. Nathan — may I?

The Court: Surely.

Mr. Chernoff: Mr. Nathan, you recall before trial I explained to you — we went through the guidelines and I explained to you that, perhaps, if you pled guilty, you would be looking at 36 to 47 months. Remember that discussion we had?

The Defendant: Yes.

Mr. Chernoff: And do you remember I said if we went to trial, you would not get acceptance of responsibility; the range would go up. I told you it would be somewhere between 51 and 63 months, something like that. Remember we had that discussion?

The Defendant: We had similar discussion.

Mr. Chernoff: And, as it turns out, the — as luck would have it, the probation department also said that the guideline range is what I told you it would probably be after trial. We had that discussion. Do you recall that?

The Defendant: We had that yesterday.

Mr. Chernoff: Is there anything other than that, that with regard to any computation or anything else in the presentence report you looked at, that you would disagree with?

The Defendant: Well, I guess this is new to me, so...

The Court: The answer would be "no"?

23

The Defendant: Your Honor, I'm at your mercy.

The Court: I'm sorry?

The Defendant: I'm at your mercy.

The Court: Okay. Well, I just wanted to give you a chance to make any objections if you had any. Okay. (Transcript of Sentencing Hearing, Document No. 278, pp. 4-6).

Based upon this record, it is evident that there was no basis, legal or factual, upon which counsel could have objected to the PSR, in writing or at the hearing. Moreover, the record controverts Nathan's suggestion that Mr. Chernoff failed to offer any mitigating factors for a lower sentence. Mr. Chernoff argued that Nathan should be sentenced to the low end of the advisory guideline sentencing range based on Nathan's minimal role in the offense:

Mr. Chernoff: I would like to point out that, of course, you sat with us, you heard all the facts; but if you recall from the facts that were presented, the indictment itself and the facts that were presented by the probation department, in the conspiracy food chain Mr. Nathan was a bottom feeder in this one. And since this would apply, these guidelines would apply, the same guideline range would apply to all these co-conspirators with regard to those three, you know, Waller Minimart, Blum Mart, and then this charged offense, I would ask you to consider the lower range of the guidelines. I think the guidelines. I think the guidelines— I can't object to the computation, but I do think— I would ask that you sentence him to the lower end of those guidelines. (Transcript of Sentencing Hearing, Document No. 278, p. 6).

Given that there was no legal or factual basis for filing objections to the PSR based on the calculation of the amount of loss, Nathan cannot show that counsel's performance fell below the standards of *Strickland.*

Nathan next challenges the methodology for the amount of loss calculation. According to Nathan, the Court used a value that was over nine years old and he was not given any credit for improvements to the property, mortgage payments, guarantees or good will. Nathan is not entitled

to relief on this claim because he raised the issue on direct appeal and the Fifth Circuit Court of Appeals concluded that his challenge to the methodology was without merit and that there had been no error by reliance on the 1998 selling price in the absence of an appraisal.  The Fifth Circuit wrote:

> Finally, Nathan argues that the district court erred when it assessed the loss for sentencing purposes using the purchase price of the collateral in 1998 instead of a 2000 bank appraisal.  He did not object at the time of sentencing and therefore, this court reviews for plain error.  The Application Note 3(E)(ii) to U.S.S.G. § 2B1.1 states that any loss amount shall be reduced by "the fair market value of the collateral at the time of sentencing" if the collateral has not been disposed of by that time.  At the time of sentencing in 2007, there is no evidence that the property had been sold and no current appraisal was presented.
>
> Under plain error review, the error must be obvious and "evidence from a plain reading of the statute."  *See United States v.  Aderholt*, 87 F.3d 740, 744 (5th Cir. 1996).  Assuming that the district court incorrectly used the 1998 purchase price instead of the 2000 appraisal, the error was not clear and obvious.  Neither side points to any further guidance in the text of the Guidelines or any precedent that states whether a more recent figure is preferable when a current appraisal is not available.  We have said, however, that where "the district court cannot achieve absolute certainty in determining the lenders' losses ...'[t]he court need only make a reasonable estimate of the loss.'"  *United States v.  Goss*, 549 F.3d 1013, 1019 (5th Cir.  2008) (quoting *United States v.  Holbrook*, 499 F.3d 466, 468 (5th Cir.  2007) (matching the language of both U.S.S.G. 2B1.1 app. n.2(c) (2001) and U.S.S.G. 2B1.1 app. n.3(C) (2007)).  Because the 1998 purchase price was a reasonable estimate of the property's value when no appraisal contemporaneous or near to the date of sentencing was available, the district court's application of U.S.S.G. 2B1.1 was not plainly wrong. (Document No.  316; *United States v.  Nathan*, 318 Fed.  App'x 273 (2009) (footnotes omitted).

The law is clear that "issues raised and disposed of in a previous appeal from a judgment of conviction are not considered."  *United States v.  Kalish*, 780 F.2d 506, 508 (5th Cir. ), *cert.  denied*, 476 U.S. 1118 (1986); *United States v.  Rocha*, 109 F.3d 225, 229 (5th Cir.  1997).

Nathan further argues that the jury was tainted by prosecutorial misconduct and by the Court's failure to voir dire the panel.  According to Nathan, the jury was tainted by the prosecution on the fifth day of trial by a conversation that counsel had with the jury outside the presence of the

25

Court.  Nathan further argues that the decision by the Court not to voir dire the juror resulted in a structural error that violated his constitutional right to a fair and impartial jury.  Nathan did not raise this claim in his direct appeal.

Pursuant to 28 U.S.C. § 2255, a federal prisoner may challenge his conviction on the basis that his " sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  Motions brought pursuant to § 2255 are reserved for claims of constitutional or jurisdictional significance.  *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1081); *Limon-Gonzalez v. United States*, 499 F.2d 936, 937 (5th Cir. 1974).

When claims of constitutional or jurisdictional import are not raised on direct appeal, the claims are procedurally defaulted, and can only be considered in a § 2255 proceeding if a movant can show cause for his failure to raise his claims on appeal, and actual prejudice resulting from the alleged errors.  *United States v. Placente,* 81 F.3d 555, 558 (5th Cir. 1996) (" [A] defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors.");  *United States v. Gaudet,* 81 F.3d 585, 589 (5th Cir. 1996) (" When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error.");  *United States v. Acklen,* 47 F.3d 739, 741-42 (5th Cir. 1995) (" Because a challenge under section 2255 ' may not do service for an appeal,'  a movant may not raise constitutional or jurisdictional issues for the first time on collateral review without establishing both ' cause'  for his procedural default

and 'actual prejudice' resulting from the error."); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (" A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude … and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error."), *cert. denied*, 502 U.S. 1076 (1992).  Procedurally defaulted claims also may be considered for the first time in a § 2255 proceeding if the movant can show that she is actually innocent.  *Bousley v. United States*, 523 U.S. 614, 622 (1998) (" Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may by raised in habeas only if the defendant can first demonstrate either 'cause' and actual prejudice … or that he is 'actually innocent.' ")

Here, even assuming that Nathan could establish cause for his failure to raise this claim on direct appeal, namely that counsel could have and should have raised the issue on direct appeal, he cannot show prejudice which has resulted from the  alleged error.  Accordingly, Nathan' s claim is procedurally barred from review in this § 2255 proceeding.

Moreover, even if this claim was not procedurally barred and Nathan had, on direct appeal, argued that jury was tainted due to am improper contact between a juror and the counsel, he has not shown he was prejudiced by the alleged contact.  Nathan appears to suggest that the prosecution team went out of its way to use the parking garage as means to seek out and improperly influence jurors.  As discussed above, Nathan has not established cause or prejudice or actual innocence to overcome the procedural default of the claim given that his ineffective assistance of counsel claim failed.  As such, the claim is procedurally barred from review. Even assuming that the claim was not procedurally barred, the record clearly shows that Nathan is not

entitled to relief on this claim.   The record shows that a juror had a brief conversation with a paralegal who was employed by the Government in the parking garage.   The matter was immediately brought to the attention of the Court.   Mr.   Chernoff did not object to the juror contact because the subject matter of the conversation (directions) was not relevant to the trial. (Document No.  286, p.  1512).   Upon this record, Nathan has not shown that his due process rights were violated as a result of the contact between the juror and a paralegal.

Next, Nathan claims the Government willfully and deliberately withheld exculpatory evidence. According to Nathan, the Government knew that Chicago Title had been fined by the Controller of the Currency and the Texas Insurance Board for conducting flip transactions and he suggests that the Government kept this information from the defense.   He further argues that the Government had not disclosed the bank appraisals that were associated with the loans made by Banco Popular and Bank United in the Waller Minimart and Blum Mart transactions.   He also alleges that the Government failed to disclose the loan files.   The Government asserts that the claims are procedurally barred and, even assuming that the claims were not procedurally barred, the claims are without merit because the Government produced all exculpatory evidence, and that as to the information about Chicago Title being fined by the Controller of the Currency and the Texas Insurance Board, the information was known to defendant prior to trial and the matter was argued at trial in the context of Motion in Limine.

The law is clear that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.  Maryland*, 373 U.S. 83 (1963).   To establish a *Brady* violation, Hamilton must show that (1) the prosecution suppressed

evidence; (2) the evidence was favorable to the defendant because it was either exculpatory or impeaching; and (3) the evidence was material. *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir. 2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433-38 (1995).

The record controverts Nathan's assertion that the Government knew about the earlier action taken against Chicago Title and failed to disclose it. (Document No. 282, p. 538, Document No. 287, 1629-1631). The matter came up in pretrial proceedings and during trial in connection with the testimony of Steve Williams. The Government noted that "at the start of trial, the Court granted a motion in limine in connection with a consent order that Chicago Title had entered into with the State and Office of the Comptroller of the Currency. (Document No. 287, p. 1629). Mr. Chernoff argued that defense should be able to question Steve Williams about this. (Document No. 287, p. 1629). Mr. Chernoff requested that he be allowed to ask Steve Williams about "whether he facilitated the flip transactions and simultaneous closing with Florence. Did he give her information on how to do that and, frankly permission to do that[,"] and ask "[whether] simultaneous closing is something that Chicago Title has traditionally performed for various entities in the past..." (Document No. 287, pp. 1629-30). The defense argued this was relevant to Williams' credibility given that "part of our defense is that Florence Hamilton did what she as told, not what she decided, and that's why that becomes important." *Id.* The Government responded that Mr. Williams was not going to deny that Chicago Title did flip transactions. (Document No. 287, p. 1631). Likewise, Nathan has not shown that the Government failed to disclose exculpatory appraisals or information about the loans in question. The record clearly shows that the Government did not withhold exculpatory evidence, and that the information was disclosed and was available to the parties.

Nathan next argues that he is actually innocent of the money laundering offenses in light of the decision by the United States Supreme Court in *United States v. Santos*, 553 U.S. 507 (2008). Nathan argues that he charged legitimate fees for real estate consultation fees and that these were the fees he received from the money lenders. According to Nathan, there was not evidence that he knew the funds he received from the lenders were profits from illegal activity. Nathan suggests that he was not aware that any expenses that were paid were the profits of bank fraud involving the illegal land flip transaction. Nathan also maintains that he was not involved any illegal activities. To the contrary, Nathan argues that he consulted and brokered hard money loans to prospective borrowers for the purchase of commercial property. He had no intent to do anything illegal. The Government responds that Nathan's reliance on *Santos* is misplaced.

The *Santos* decision involved money laundering under 18 U.S.C. 1956(a)(1)(A)(I). In *Santos*, the Court considered whether the term "proceeds" in the federal money laundering statute, 18 U.S.C. 1956(a)(1), means "receipts" or "profits." *Id.* at 509. *Santos* involved money laundering in which the gross proceeds from an illegal lottery were used to pay employees and lottery winners. *Santos*, 553 U.S. at 509. Because the transactions involved paying the costs of running the illegal lottery, they involved the lottery's gross receipts but not its profits. In a divided opinion, the Supreme Court affirmed the Seventh Circuit's reversal of Santos's money laundering conviction. In a 4-1-4 decision, the plurality of Justices Scalia, Souter, Thomas and Ginsburg, held that the term "proceeds," which was undefined in the statute, was ambiguous and without legislative history adequate to clarify its meaning. *Id.* at 511-12. Applying the rule of lenity, the plurality held that "proceeds," as used in § 1956(a)(1) means "profits," not total "receipts," from the criminal activity conducted. Applying this holding, the plurality concluded that "a criminal who enters into a transaction paying the expenses

of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid." *Id.*, at 517.  Justice Stevens concurred in the judgment to the extent that with respect to the gambling enterprise, Congress had not indicated its intent as to whether "proceeds" should be defined to include all "receipts" or just the "profits." *Id.* at 524-26 (Stevens, J., concurring).  Justice Stevens declined to join the plurality in its holding that "proceeds" as used in §1956 always means "profits" under the rule of lenity.  *Id.*  Rather, Justice Stevens stated that "proceeds" must mean "profits" whenever a broader definition would "perverse[ly] result in a "merger problem."  533 U.S. at 527, 528 n.  7.  Because *Santos* was a 4-1-4 decision, the application of the case has not been clear or straightforward.[2]  "The precedential value of *Santos* is unclear outside the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts."  *United States v. Brown*, 553 F.  3d. 768, 783 (5th Cir. 2008), *cert.  denied*, 130 S.Ct.  246 (2009).  "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds."  *Marks v.  United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted); *Garland v.  Roy*, 615 F.3d 391, 399 (5th Cir.  2010)("Justice Stevens' concurrence controls and therefore determines the scope of the Court's holding.").  Justice Stevens' concurrence instructs that "the same word can have different meanings in the same statute. [Therefore], this Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous

---

[2] Congress, on May 29, 2009, amended the money laundering statue to expressly define proceeds to include gross receipts.  18 U.S.C. § 1956(c)(9) (2009), and a result *Santos* has been superseded.  This amendment does not apply to the instant action, which must be decided under the old statute and *Santos*.

some applications may be." *Santos*, 533 U.S. at 525 (Stevens, J., concurring) (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004)).  Given this caveat, *Santos* has been applied differently by Circuit courts.  In *Garland v. Roy*, 615 F.3d 391, 403 (5ᵗʰ Cir. 2010),[3] a case which involved money laundering with an underlying pyramid scheme, the Fifth Circuit Court of Appeals discussed the various Circuit positions as follows:

> The Fourth, Eighth and Eleventh Circuits have held that in light of Justice Stevens' concurrence, *Santos* defines "proceeds" as "profits" only when courts are presented with the particular facts of *Santos*, where the petitioners were convicted of laundering money from the "unlawful activity" of running an illegal gambling operation.  The Third and Seventh Circuits have concluded that Justice Stevens' concurrence indicate "proceeds" must be defined as "profits" any time the legislative history of the money-laundering statute does not affirmatively indicate otherwise.  Analogous to the first step of Justice Steven' bifurcated rule, the Ninth Circuit and, likely, the First Circuit have held that "proceeds" must be defined "profits" any time the "merger problem" articulated in *Santos* would result if "proceeds" is defined as "gross receipts."  Finally, similar to both steps in Justice Stevens' rule, the Sixth Circuit has held, "'proceeds' does not always mean profits, as Justice Scalia concluded; it means profits only when the § 1956 predicate offense creates a merger problem that *leads to a radical increase* in the statutory maximum sentence *and* only when nothing in the legislative history suggests that Congress intended such an increase.'  (citations omitted) (emphasis in original).

The Fifth Circuit suggested that *Santos* may apply more broadly, i.e, to other predicate offenses than illegal gambling, and that it was retroactively applicable to cases on collateral review.  Under the facts of *Garland*, the Fifth Circuit concluded that Justice Steven's concurrence required a bifurcated approach, which required the court to determine first whether giving "proceeds" a broad interpretation to mean "receipts" would result in merging the underlying illegal activity with the money laundering charge.  Second, if there is a merger problem, the court must then examine the

---

[3] *Garland* involved a pyramid schemer's payments to early investors to keep his fraud going.  The Fifth Circuit suggested that those payments had possibly merged with the underlying mail and securities fraud charges because the same transactions gave rise to both the underlying fraud charges and those for money laundering.  *Garland*, 615 F.3d at 400, 404.

legislative history of the money laundering statue to determine if "proceeds" should be defined as "profits" in a particular case.  *Id.*  at 403-04.  The Fifth Circuit has made clear that *Garland's* bifurcated test need not be applied to all challenges to the money laundering statute under *Santos*. For example, in *Wilson v. Roy,* 643 F.3d 433 (5th Cir.  2011), the Fifth Circuit held that in the context of narcotics offenses which include money laundering of the proceeds of the sales of illegal drugs, the bifurcated analysis did not apply to drug offenses, and as a result *Santos* did not undermine the money laundering convictions.  *Id.*  at 436-37 & fn.  3.

The Government argues that Nathan's conviction falls squarely within Justice Stevens' plurality opinion because Nathan used gross revenues from the bank fraud to commit the offense of money laundering.  According to the Government, the Fifth Circuit upheld a money laundering conviction where the definition of proceeds under *Santos* was not submitted to the jury, as was the case here.

In *United States v.  Cooks*, 589 F.3d 173, 178-79, 181-82 (5th Cir. 2009), *cert.  denied*, 130 S.Ct.  1930 (2010), the defendant participated with others in a scheme to defraud mortgage lenders. Cook recruited real estate investors to serve as "straw purchasers" for homes.  *Id.*  at 178.  Cook and two mortgage brokers created loan applications for the straw purchasers and misrepresented to the lending institution that the house was worth more than its real value and that the "straw purchaser" qualified for the loan.  *Id.*  Cook appealed his conviction and argued that his money laundering conviction was invalid under *Santos* because the jury was not instructed that the word "proceeds" meant "profits" and not receipts.  The Fifth Circuit first found this argument unpersuasive.  In so doing, the Fifth Circuit recognized the uncertain precedential value of *Santos*.  Second, relying on *United States v.  Brown*, 553 F.3d 768, 784-85 (5th Cir. 2008), *cert.  denied*, 130 S.Ct.  246 (2009),

in which the Fifth Circuit held that "in cases where the evidence indicates that the specified unlawful activity was profitable and the charged transactions incurred some modicum of profit, a failure to include a profits definition of proceeds in the jury instructions does not meet the plain error standard," *id.* at 180, the Fifth Circuit found that because the evidence at trial showed that the mortgage loan amount was based on the inflated value amount and that after the closing Cook sold the home to the straw purchaser for more than he bought it with the difference being pure profit for Cook, that the failure to include a "profits" definition of proceeds in the jury instructions did not meet the plain error standard.

The Government argues that Nathan, after the bank fraud was committed, directly profited from the scheme. The Government maintains it is of no consequence that there was no proof that Nathan used the "profits" of bank fraud before finding him guilty of the money laundering charge.

In *Cotton v. Keffer*, Civil Action No. 4:10-CV-545-Y, 2011 WL 3611489 (N.D. Tex. April 25, 2011), Cotton was convicted of bank fraud and money laundering. In her § 2241 petition, she argued that she was actually innocent of money laundering under 18 U.S.C. § 1957 in light of *Santos*. The Court found her argument without merit. The Court wrote: "[a]ssuming, without deciding that *Santos* applies to § 1957, Cotton fails to explain how the transactions charged as money laundering were essential expenses, and not profits, of the bank frauds and false statement offenses."

Here, applying *Santos* to Nathan's money laundering conviction, he has not shown that he is actually innocent of money laundering under *Santos*. Nathan's bank fraud offense was defined by the obtaining of money fraudulently. In contrast, the money laundering offense was defined by transferring of the proceeds after the fraud was complete for purposes other than the expenses of the bank fraud. Nathan has not shown that the same transaction was used to prove both the underlying

34

unlawful activity (bank fraud) and the money laundering charges.  *Garland*, 615 F.3d at 404.  Rather, the transfers of money were made out of the escrow account *after* the predicate offense of bank fraud was complete.  *See also United States v.  Halstead*, 634 F.3d 270, 280-81 (4th Cir. ), *cert.  denied*, 131 S.Ct.  3043 (2011); *United States v.  Kasprowicz*, No. 10-30334, ___Fed.Appx.___, 2011 WL 3586111(9th Cir.  Aug.  16, 2011).   Nathan's claim that he is actually innocent of money laundering under *Santos* fails.

Finally, Nathan argues he was prejudiced by the untimely disclosure of the PSR.  Nathan argues that he had less than 20 hours to read, investigate and object to the PSR, which should have been disclosed 35 days prior to sentencing pursuant to Federal Rule of Criminal Procedure 32(e)(2).  The docket sheet shows that the PSR had been available since June 8, 2007, nearly a month before the July 13, 2007, Sentencing Hearing.   According to Nathan, neither counsel nor the Court attempted to explain the PSR or why he was sentenced to 60 months.

Rule 32(e)(2) provides: "The probation officer must given the presentence report to the defendant ... at least 35 days before sentencing unless the defendant waives this minimum period".  Here, even assuming that Nathan did not have the requisite number of days, upon this record, Nathan has not shown that counsel was unprepared for sentencing or that the PSR had not been explained to him prior to sentencing, or that his sentence would have been different had he received the PSR 35 days prior to the sentencing hearing.  *See Puckett v.  United States*, ___U.S.___, 129 S.Ct.  1423, 1429 (2009)(explaining that, for an error to warrant reversal for plain error, it "must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings" (internal quotation marks and citation omitted)).  The record shows that Nathan affirmatively stated on the record that he had read over the

PSR prior to sentencing, and that counsel had explained it to him.   The record further shows that

Judge Harmon gave Mr.  Chernoff additional time, off the record, to confer with Nathan about the

PSR.  (Transcript of Sentencing Hearing, Document No.  278, pp.  2-4).

> Mr.  Chernoff: Mr.  Nathan, you recall before trial I explained to you — we went through the guidelines and I explained to you that, perhaps, if you pled guilty, you would be looking at 36 to 47 months.  Remember that discussion we had?
>
> The Defendant: Yes.
>
> Mr.  Chernoff: And do you remember I said if we went to trial, you would not get acceptance of responsibility; the range would go up.  I told you it would be somewhere between 51 and 63 months, something like that.  Remember we had that discussion?
>
> The Defendant: We had similar discussions.
>
> Mr.  Chernoff: And, as it turns out, the — as luck would have it, the probation department also said that the guideline range is what I told you it would probably be after trail.  We had that discussion.  Do you recall that?
>
> The Defendant: We had that yesterday.
>
> Mr.  Chernoff: Is there anything other than that, that with regard to any computation or anything else in the presentence report you looked at, that you would disagree with?
>
> The Defendant: Well, I guess this is new to me, so...
>
> The Court: The answer would be "no"?
>
> The Defendant: Your Honor, I'm at your mercy.
>
> The Court: I'm sorry?
>
> The Defendant: I'm at your mercy.
>
> The Court: Okay.  Well, I just wanted to give you a chance to make any objections if you had any.  Okay. (Transcript of Sentencing Hearing, Document No.  278, 5-6).

With respect to Nathan's suggestion that no explanation was given by the Court concerning the

length of his sentence, the record controverts his assertion.  Judge Harmon stated:

> Igbanibo C. Nathan is before the Court as a result of his convictions for conspiracy to commit bank fraud, conspiracy to commit money laundering, and aiding and abetting money laundering.  He has no prior criminal history.
>
> Regarding the instant offense, the defendant, along with his wife and other co-conspirators in this case, were involved in a scheme to fraudulently secure more than $5 million in loans from federally-insured financial institutions which were guaranteed by the Small Business Administration.
>
> Based on a preponderance of the evidence, this defendant is responsible for a total intended loss of $987,611.  His abuse of the Small Business Administration was selfishly motivated by economic factors.  His role is sanctioned by offense level increases.  Of significance is his failure to truthfully testify at his and co-conspirator's trial.  His guideline range is 51 to 63 months.
>
> Considering the totality of factors, a sentence at the high end of the guideline range, 60 months, appears to be sufficient to satisfy the sentencing objectives under the guidelines, including the need to promote respect for the law.  I have considered guidelines and find that a sentence within those guidelines is consistent with and takes into account the purposes of 18 United States Code, Section 3553(A).  (Document No.  278, Transcript of Sentencing Hearing, pp.  7-8).

Because Nathan has not shown that his sentence would have been different had he received the PSR 35 days prior to the sentencing hearing his claim fails.  Likewise, to the extent that Nathan claims that Judge Harmon failed to explain the rationale for his 60 month sentence, the record controverts his claim.

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion

(Document No. 364) be GRANTED, and that Movant Igbanibo Nathan's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 351) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 4th day of January , 2012.

Frances H. Stacy
United States Magistrate Judge